J-S30003-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| REYNOLD G. HENRY | : | |
| | : | |
| Appellant | : | No. 103 MDA 2021 |

Appeal from the Judgment of Sentence Entered January 12, 2021
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0004042-2017

BEFORE:   BENDER, P.J.E., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY BENDER, P.J.E.:            **FILED OCTOBER 21, 2021**

Appellant, Reynold G. Henry, appeals from the January 12, 2021 judgment of sentence of an aggregate term of life imprisonment, followed by a maximum of thirty-two (32) years' imprisonment, imposed after he was convicted of one count each of murder of the second degree,[1] aggravated assault – bodily injury with a deadly weapon,[2] persons not to possess a firearm,[3] firearms not to be carried without a license,[4] and possessing

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(b).

[2] 18 Pa.C.S. § 2702(a)(4).

[3] 18 Pa.C.S. § 6105(a)(1).

[4] 18 Pa.C.S. § 6106(a)(1).

instruments of crime ("PIC").[5]  Appellant challenges the sufficiency of the

evidence to sustain his convictions.  We affirm.

The trial court summarized the relevant facts and procedural history of

this matter in its Pa.R.A.P. 1925(a) opinion, as follows:

> In the early evening hours of July 18, 2017, fourteen-year-old
> Bruce Cridell, Jr. [("Cridell")] came to Reading from his home in
> York, Pennsylvania.  The purpose of the trip was to buy a gun from
> … 23-year-old [Appellant].  The young, albeit streetwise, Cridell
> was able to get a ride with some friends.  The driver of the vehicle
> was Diana Gonzalez [("Gonzalez")].  Also along for the ride was …
> Cridell's friend, 19-year-old Saul Ortiz [("Ortiz")].  Throughout the
> trip from York to Reading, numerous text messages were sent
> back and forth between … Cridell and [Appellant].  Some of these
> texts were in the form of negotiations for the price of the handgun.
> In addition to the negotiations, [Appellant] sent a video of the gun
> to [Cridell].  Unbeknownst to … Cridell, [Appellant] had been
> separately texting another friend about a plan to keep the gun and
> take the money from his unsuspecting, youthful buyer.
>
> Upon arriving in Reading, … Gonzalez drove to the McDonald's
> restaurant located at 1001 North 9th Street.  This was the meeting
> place that had been pre-arranged between … Cridell and
> [Appellant].  The time was now approximately 6:30 p.m.  Once in
> the parking lot, … Cridell got out of the vehicle and, against the
> previously texted wishes of [Appellant], he had … Ortiz accompany
> him to meet [Appellant] just inside the doorway of the
> McDonald's.
>
> [Appellant] immediately led [Cridell] and … Ortiz away from
> McDonald's on foot.  A little less than one (1) hour later, video
> cameras show [Appellant] leading … Cridell and … Ortiz into an
> alleyway.  This alleyway is only three (3) blocks away from the
> McDonald's parking lot and it connects the 900 block of Mulberry
> Street, video surveillance shows the three individuals walk
> halfway through the alley.  At the halfway point, [Appellant]
> makes a left onto an intersecting alleyway called "Market Place."
> [Cridell] turns to follow [Appellant].  Within one second of … Cridell

---

[5] 18 Pa.C.S. § 907(a).

walking out of view of the video towards [Appellant], shots are fired. [Ortiz]—still in full view—ducks, turns and runs back towards Mulberry Street. Video then captures [Appellant] running south[,] away from the scene. Back on Mulberry Street, video captures … Ortiz coming out of the alleyway and across the street to talk to a local resident. As … Ortiz and the local resident look north towards the alleyway entrance, 14-year-old … Cridell can be seen stumbling out of an alleyway several houses south of where … Ortiz is looking. [Ortiz] never sees his friend, [Cridell], falling off the curb and onto the street. As … Ortiz starts his walk back towards the McDonald's, … Cridell dies from a single shot that entered the top of his left shoulder, passing though the left carotid artery and trachea, finally stopping at his right collarbone.

The following day, [Appellant] was arrested and brought to City Hall for an interview, during which he offered two versions of what occurred. After additional investigation, [Appellant] was criminally charged with murder of the first degree,[1] murder of the third degree,[2] two (2) counts of aggravated assault,[3] firearms not to be carried without a license, [PIC], and persons not to possess a firearm. On October 24, 2018, the criminal information was amended to add murder of the second degree.

[1] 18 Pa.C.S.[] § 2502(a).

[2] 18 Pa.C.S.[] § 2502(c).

[3] 18 Pa.C.S.[] § 2702(a)(1), (4).

A jury trial commenced on Monday, November 16, 2020. On Thursday, November 19, 2020, [Appellant] was found guilty by a jury of murder in the second degree, aggravated assault[—]bodily injury with a deadly weapon[], firearms not to be carried without a license, and [PIC]. Sentencing was deferred until January 12, 2021. On the date set for sentencing, [Appellant] entered a plea of guilty to count 6, persons not to … [possess a] firearm. After [he] entered his plea, [Appellant] was sentenced on all counts as follows: Count 2 – murder of the second degree: life in prison without the possibility of parole; Count 5 – aggravated assault: thirty (30) months to five (5) years;[10] Count 6 – persons not to [possess] firearms: sixty (60) months to ten (10) years;[11] Count 7 – firearms not to be carried without a license: forty-two (42) months to seven (7) years;[12] and Count 8 – [PIC]: fifteen (15) months to five (5) years.[13] In sum, [Appellant] was sentenced to a total aggregate term of life imprisonment followed by a

- 3 -

maximum of thirty-two (32) years in a state correctional institution.

[10] Count 5 was ordered to run concurrent with Count 2 (murder of the second degree) for sentencing purposes.

[11] Count 6 was ordered to run consecutive to the sentence imposed at Count 5.

[12] Count 7 was ordered to run consecutive to the sentence imposed at Count 6.

[13] Count 8 was ordered to run consecutive to the sentence imposed at Count 7.

Trial Court Opinion ("TCO"), 5/12/21, at 1-3 (unnecessary capitalization and some footnotes omitted).

On January 13, 2021, Appellant filed a timely notice of appeal, followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court filed its Rule 1925(a) opinion on May 12, 2021. Herein, Appellant presents the following question for our review: "Whether the Commonwealth failed to present sufficient evidence to support the conviction on the charge of [m]urder of the [s]econd [d]egree as the Commonwealth failed to prove that the killing occurred during the course of a robbery?" Appellant's Brief at 5.

Our standard of review of sufficiency claims is well-settled:

In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011) (citations omitted).

Section 2502(b) of Title 18, which defines murder of the second degree, states: "A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or as an accomplice in the perpetration of a felony." 18 Pa.C.S. § 2502(b). Section 2502(d) defines "perpetration of a felony" as: "The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." 18 Pa.C.S. § 2502(d). "The malice or intent to commit the underlying crime is imputed to the killing to make it second-degree murder, regardless of whether the defendant actually intended to physically harm the victim." *Commonwealth v. Rivera*, 238 A.3d 482, 500 (Pa. Super. 2020).

The underlying felony that was charged in this case was robbery.

> To sustain a conviction of robbery, the Commonwealth must establish beyond a reasonable doubt that appellant, in the course of committing a theft, inflicted serious bodily injury upon [another], or threatened him with or intentionally put him in fear of immediate serious bodily injury. 18 Pa.C.S.[] § 3701(a). The element "in the course of committing a theft" is proven if the Commonwealth proves that the offense occurred during an attempt to commit theft or in flight after the attempt or commission. 18 Pa.C.S.[] § 3701(a)(2). An attempted theft is committed when a person, with intent to commit a theft, does any act which constitutes a substantial step toward commission of the theft. 18 Pa.C.S.[] § 910(a). A person commits a theft if he or she "unlawfully takes … movable property of another with intent to deprive him thereof." 18 Pa.C.S.[] § 3921(a).

- 5 -

*Commonwealth v. Ennis*, 574 A.2d 1116, 1119 (Pa. Super. 1990)

Here, Appellant claims that the evidence was insufficient to support his conviction of second-degree murder, as the Commonwealth failed to prove that he shot and killed the victim during the course of committing a robbery. Appellant's Brief at 10. Appellant argues there is no evidence to support the Commonwealth's proposition that he stood in the alleyway with any intention other than to sell Cridell the gun. *Id.* at 11. He further avers that, although there are inferences that he discussed the possibility of deceiving Cridell with Wakeem Mercado ("Wockie"), there is no evidence that he took any substantial step in committing a theft. *Id.* at 12. Appellant insists that he "simply pulled out his gun [and] shot Cridell[.]" *Id.* at 13. While such actions may constitute third-degree murder, Appellant concludes there is no evidence that his actions constitute an attempted theft and, therefore, he is entitled to a dismissal of the second-degree murder charge. *Id.* Appellant's claim is meritless.

There is no question that Appellant killed Cridell. TCO at 7. "Appellant unequivocally testified during the trial that he alone shot and killed [Cridell,]" and his testimony "that he fired his gun three times is entirely consistent with the three shell casings that were found at the scene" and were admitted into evidence by the Commonwealth. *Id.* Thus, we turn to the question of whether there was sufficient evidence to support the jury's finding that the murder occurred during the commission of a robbery.

In support of Appellant's second-degree murder conviction, the trial court summarized the following relevant facts and evidence presented at trial:

Danita Sanders is the mother of the victim, [Cridell]. Ms. Sanders testified that her son had two (2) cell phones. One of those cell phones was an Apple iPhone. She also testified that her son had a Facebook account and that the name on his account was 'Frank Stackzz,' a moniker based on a comic character. Ms. Sanders and her daughter were able to access [Cridell's] Facebook Messenger account and confirmed that her son had been communicating with someone known as "Rondo." Rondo is later identified as being [Appellant]. Ms. Sanders stated that she also found separate communications with someone named "Saul" and that is how she learned that her son had gone to Reading.

On July 19, 2017, one day after the murder of [Cridell], criminal investigator[,] Eric Sweitzer[,] executed a search warrant for [Appellant's] home as well as an arrest warrant for [Appellant]. Investigator Sweitzer testified that he went to the home of [Appellant], located at 520 Moss Street in Reading, Berks County, Pennsylvania. Once he arrived, he arrested [Appellant] and was able to seize a cell phone that fell from [his] person. The cell phone, a gold iPhone 5S, was turned over to [the] lead investigator, … John Carrasquillo. [Appellant's] phone was subsequently turned over to criminal investigator[,] Joseph Snell[,] for the purposes of conducting a forensic extraction of data.

[Investigator Snell] was presented with the cell phone of [Appellant,] as well as the cell phone that was taken from the body of [Cridell]. Investigator Snell is trained and proficient in digital forensic searches of cellular phones[,] as well as interpreting street slang that is commonly used in text[-]based messaging. In addition to his assignments with the Reading Police Department, … Investigator Snell is also assigned to the targeted enforcement and gang group out of the Philadelphia Office of the Department of Homeland Security. As part of a stipulation, … Investigator Snell was admitted as an expert in the fields of forensic examination of cell phones and street language.

[] Investigator Snell testified that he was provided with two (2) cell phones. One of the cell[]phones was a black and silver iPhone 5S that was found on … Cridell. The other cell[]phone was … the

gold iPhone 5S that belonged to [Appellant]. Investigator Snell was able to extract digital data from both of these phones. This data was downloaded onto a compact disc and included Facebook messages, text messages, and incoming and outgoing calls. Investigator Snell was able to identify Facebook, text, and phone conversations between [Cridell] and [Appellant] prior to Cridell's death. He was also able to identify several calls and text messages from [Appellant's] phone that were made to other individuals that were involved in this incident.

### 1. Phone Information from [Cridell]

Investigator Snell testified that he analyzed the Facebook messenger account from the victim, [Cridell]. Inside this account was a detailed conversation between [Appellant] and [Cridell] during the hours leading up to Cridell's death. The conversation commenced at 3:09 p.m.[,] on July 18, 2017. Investigator Snell was able to interpret the "street language" that was being used in the conversation. Investigator Snell testified that the conversation start[ed] with the victim['s] telling [Appellant] that he had $200.00 to buy a gun. The victim also told [Appellant] that he has a car to travel to Reading and that he [would] come to [Appellant's] location to get the gun. The victim then attempt[ed] to renegotiate the price of the gun to $175.00 because he need[ed] gas to get to Reading. [Appellant] accept[ed] the offer and then ask[ed] … Cridell who [was] coming with him to Reading. Cridell respond[ed] by telling [Appellant] that he [was] with a friend as well as some girls who [were] in the car. [] Cridell [told Appellant] that he [would] tell his friends to wait in the car when he [got] to Reading. [Appellant] specifically [told] Cridell that he [did not] want any "hot transactions," meaning he [did] not want anybody else witnessing the transaction.

At this point in the conversation, … Cridell [began] to ask questions about the gun. Specifically, he want[ed] to know how many rounds of ammunition fit in the gun. [Appellant] respond[ed] by telling Cridell that there [were] 12 bullets in the magazine and one that [was] in the chamber of the weapon. [Appellant] [sent] Cridell a video of the gun, to which Cridell state[d] that he like[d] what he [saw] and that he want[ed] the gun. [Appellant] then ask[ed] Cridell who the gun [was] for. [] Cridell respond[ed] that it [was] for himself. [Appellant] then ask[ed] Cridell if he [was] in the Crips gang. Cridell confirm[ed] that he [was] a member of the Crips gang. [Appellant] then

attempt[ed] to recruit Cridell into [Appellant's] "subset" of the Crips gang. [] Cridell refuse[d] [Appellant's] offer but reassure[d] [him] that everything is still "cool" between the two of them. [] Cridell and [Appellant] both indicate[d] that they know "Cdot Moises"—a member of the Crip [*sic*] gang. Later in the trial, [Appellant] testified that Cdot Moises was a member of the Crips who arranged for [Appellant] to meet … Cridell to sell him a firearm.

The remainder of the Facebook messages between … Cridell and [Appellant] focus[ed] on the meeting location in Reading (the McDonald's parking lot on North 9th Street) and when Cridell [was] expected to arrive. [Appellant told] Cridell that this transaction need[ed] to occur before 7 p.m., as that is when his mom [would] be home. The final Facebook message [was] … Cridell telling [Appellant] that they [had] arrived in the parking lot of the McDonald's.

Investigator Snell next testified about some of the phone calls that he was able [to] extract from … Cridell's phone. Investigator Snell testified that Cridell made two phone calls[,] at 6:43 p.m. and again at 6:46 p.m.[,] to a number that was identified as being [Appellant's] iPhone.

Investigator Snell then focused on some text messages that were taken from the phone of the victim, [Cridell]. One of the text messages sent to [Appellant told] him to "come out [of the McDonald's] with that jawn," meaning the item or thing. Investigator Snell completed his testimony by discussing text messages between … Cridell and … Gonzalez—the driver of the vehicle that brought … Cridell to Reading and was still waiting in the McDonald's parking lot. At 7:16 p.m., … Gonzalez [told] … Cridell that the other female passenger had to go home. This was followed up with … Gonzalez['s] asking … Cridell for an address of where to pick him and … Ortiz up. Cridell responded to … Gonzalez by texting back: "13th n oley." This was the last communication ever made by the victim….

### 2. Phone Information from [Appellant]

Perhaps the most incriminating evidence against [Appellant] was in the form of messages that were taken from [Appellant's] phone.

Specifically, Investigator Snell focused on messages between [Appellant] and an individual known as "Wockie." Notably, these

text messages between [Appellant] and … Wockie … start on July 17, 2017, the day before the murder. The final messages occur in the early morning hours of July 19, 2017, several hours after the murder of [Cridell].

On July 17, 2017, at approximately 10:17 p.m., [Appellant] sen[t] a text message to Wockie stating[,] "Yo I can hit a stain on this young nigga he looking for a toy" and "He got S131[."] … Investigator Snell testified that [Appellant was] telling Wockie that there[ was] another individual looking to buy a gun[,] and that "hit a stain" means … [Appellant was] "going to set up this person to rob him." Wockie respond[ed] to [Appellant] by wanting to know how [Appellant was] going to do it. [Appellant] respond[ed] that he is trying to "figure that out now[."] Wockie then want[ed] to know who the person [was] that [Appellant was] going to rob and [Appellant] respond[ed] by sending Wockie a screenshot of a conversation [Appellant] had with Cdot Moises—the person who arranged the sale between [Appellant] and [Cridell]. The screenshot state[d] that the person ([] Cridell) was from Reading originally.

Wockie start[ed] to express concern to [Appellant,] saying that he [did not] know or[] he[ was] not sure about this. [Appellant] respond[ed] by reassuring Wockie that "He's not known he some young north side nigga[."] Wockie immediately respond[ed] "Fuck that nigga he knows u tho is he strapped," meaning that Wockie wants to know if the person buying the gun [was] carrying a weapon. [Appellant] again reassure[d] Wockie by stating that the person does not have a gun because that is exactly what the person is looking to buy. Wockie then ask[ed Appellant] if the person want[ed] a gun to which [Appellant] responds: "Yeah he looking for one. Nigga mad young lmao he only 15 or 16 he jaccin north side[."] Wockie question[ed] whether the buyer want[ed] to buy the gun for someone else, to which [Appellant] respond[ed,] "Nah it's for him, trust me bro[."] Wockie then want[ed] to know whether the person (Cridell) [was] "solo or what's going on[,]" to which [Appellant] text[ed] that "Ima find out now."

After being told by [Appellant] that he want[ed] to "burn" the buyer, Wockie suggest[ed] to [Appellant] how the robbery should occur. He [told Appellant] that he should "either go down with the gun and take the money, or just tell him, I'm going to take the money and go back and get the gun" and then just "burn" him, or rip him off by not returning with the weapon. In response,

[Appellant] agree[d] with Wockie and then suggest[ed] that the two of them [would] split the money amongst them. Obviously, none of these conversations [were] shared with [Cridell].

The next communication we [saw] between Wockie and [Appellant was] on July 19, 2017[,] at approximately 12:07 a.m., nearly four-and-a-half hours after the murder of [Cridell]. Wockie ask[ed] [Appellant]: "Wassup bro[."] In response, [Appellant sent] two pictures to Wockie. The pictures … [were] of a newspaper article discussing the murder of … Cridell …, several hours prior. Wockie respond[ed] to this by sending one final message to [Appellant]: "Shit crazy bro u good stay low like we talked about."

Investigator Snell testified that at some point after the murder of … Cridell, [Appellant] accessed his own Facebook account through his phone and deleted that account. [Appellant], who later testified on his own behalf, acknowledged that he ultimately deleted not only his Facebook account, but also any contact he had with [Cridell]. [Appellant] admitted that he deleted all this information from his phone because he knew that it contained "incriminating information."

*Id.* at 7-14 (citations to record, unnecessary capitalization, and some quotation marks and brackets omitted).

Moreover, Appellant testified on his own behalf at trial and did not dispute any of the data that was extracted from his cell phone. *Id.* at 14. He merely attempted to clarify the factual events by stating that he: (1) acted in self-defense; and (2) that the person he was going to "burn" was Cdot Moises—"the mysterious 3rd person who merely put [Appellant] and [Cridell] in touch with each other." *Id.* The trial court found that Appellant's testimony regarding his attempt to "burn" someone other than Cridell was wholly contradicted by the text messages between Appellant and Wockie.

[Appellant] clearly was referring to a young person who used to live in Reading and that he was not only going to "burn" him on the transaction, but that he was going to split the money with

> Wockie. Other than passing references to Cdot Moises as the person who got the victim and [Appellant] in contact, there was absolutely no testimony that connected Cdot Moises to the gun. In fact, [Appellant] readily acknowledged that the gun was given to him by Wockie[,] who obtained the gun from Commonwealth witness Joel Perdomo-Velez. In short, no evidence was ever presented that would lead a jury to believe that Cdot Moises had any interest in the gun that was going to be sold to [Cridell].

*Id.* Accordingly, the trial court found it "extremely reasonable" that the jury did not find Appellant's testimony to be credible as to who was the intended target of the robbery. *Id.*

Regarding his testimony that he had acted in self-defense, Appellant acknowledged this was the first time he invoked the "self-defense" theory, and that this newest version of the events completely contradicted the two prior versions that he told the police. *Id.* at 15. Appellant admitted that he was meeting up with Cridell for the purpose of selling him a gun, and that he led Cridell and Ortiz to the alleyway that connected North 10th Street and Mulberry Street.

> In describing the moment of the shooting, [Appellant] testified that he walked through the alley and then turned into a "cut out"— the perpendicular alley known as "Market Place" where the shooting occurred. [Appellant] told the jury that as soon as [Cridell] turned the corner to follow him, that Cridell lunged toward [Appellant] in an attempt to take the gun. [Appellant] testified that he lifted his shirt and that he began to "tussle" with the victim. [Appellant] stated that he then looked back to … Ortiz, who was behind the victim. At that moment, he stated that he saw a "glimpse of a firearm" on … Ortiz and that he got scared and fired his weapon three times. On cross[-]examination, [Appellant] appeared to contradict his own testimony by admitting that his eyes were closed when he fired the shots, thus leading to a situation where he "couldn't have been aware of the danger around him."

*Id.* at 15-16. The trial court found this testimony to be completely contradicted by the only other eyewitness to the murder—Ortiz. *Id.* at 16.

> Ortiz testified that he accompanied [Cridell] to … Reading for the purpose of buying a gun. [] Ortiz noted that … Cridell was familiar with Reading and that he was told they were going to meet [Appellant] in a McDonald's parking lot. After meeting [Appellant] at the McDonald's, … Ortiz testified that [Appellant] led them to a house where [Appellant] said the gun was located. [] Ortiz stated that [Appellant] walked into a small alley between the houses that led to the back of the home. He testified that [Appellant] did this a couple of times but kept returning without a gun to sell to … Cridell. [] Ortiz stated that … Cridell started to get agitated, saying that he believed [Appellant] was "wasting their time." [] Ortiz stated that he and … Cridell were about to leave when [Appellant] told them that he could get another gun and that they should follow him. [] Ortiz then testified that [Appellant] led them up one street, down another street and finally, into an alleyway. He testified that it was [Appellant's] idea to go into the alleyway. He also testified that [Appellant] was "acting nervous" as he led the way through the alley.
>
> Once in the alleyway, … Ortiz testified that [Appellant] walked halfway through the alley at which point he made a left into another alley. At the time that … Cridell turned to follow [Appellant], … Ortiz stated that … Cridell was within arms-reach of [Appellant] and that he was behind [Cridell], but approximately 10 feet from [Appellant]. Once [Cridell] turned the corner, … Ortiz testified that [Appellant] pulled a gun and "that's when the shots went off."
>
> [] Ortiz testified that no words had been spoken and that the gun had been hidden underneath [Appellant's] shirt and in his waistline. [] Ortiz testified that he immediately ran out of the alley in the direction from which he came.

*Id.* at 17.

Finally, the Commonwealth presented the testimony of Criminal Investigator Michael Perkins. Investigator Perkins prepared a compilation video out of a series of videos he collected from various surveillance cameras

throughout Reading, which documented Appellant's movements from the afternoon of July 18 up to and including him running away from the scene of the shooting. *Id.* The trial court concluded that the video supported Ortiz's account of what happened in the alleyway. Moreover, as the video was played for the jury at various points during the trial, the trial court found "that the jury was in the very advantageous position of being able to assess the credibility of the only two eyewitnesses while watching the events unfold in real time on video." *Id.* at 18. The trial court determined that "the jury acted well within its authority as fact-finders in choosing to credit the testimony of the Commonwealth's witnesses[,] while choosing to reject [Appellant's] theory of self-defense." *Id.*

Based on our review of the facts in the light most favorable to the Commonwealth as the verdict winner, we conclude there was sufficient evidence to support the trial court's finding that Appellant committed murder of the second degree. Therefore, we uphold Appellant's conviction.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/21/2021